UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRAY MARCELINO LOPEZ RODRIGUEZ, et al., | No.  2:08-cv-01971-MCE-KJN |
| Plaintiffs, | |
| v. | **MEMORANDA AND ORDER** |
| SGLC, INC. et al., | |
| Defendants. | |

    This action for unpaid wages, breach of contract, violation of California labor and

housing laws, unfair competition, and fraud proceeds on Plaintiffs' Second Amended

Complaint filed against, among others, Defendants SGLC, Inc., Salvador Gonzalez,

Julian Gonzalez, Salvador Gonzalez doing business as Salvador Gonzalez Farm Labor

Contractor (collectively, "SGLC Defendants" or "SGLC") and Vino Farms ("Vino").

Presently before the Court is Vino's Motion for Summary Judgment, pursuant to Federal

Rule of Civil Procedure 56.[1]  (ECF No. 168.)  Plaintiffs filed a timely opposition.  (ECF

No. 206.)  For the reasons set forth below, Vino's Motion is GRANTED in part and

DENIED in part.[2]

---

[1] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.
[2] Because oral argument will not be of material assistance, the Court ordered this matter submitted on the

1
2

**BACKGROUND**

Vino grows wine grapes in the San Joaquin Valley and other parts of California. SGLC is a licensed farm labor contractor located in Galt, California.  SGLC contracts with Vino and other agricultural growers to supply farm labor.  Plaintiffs are Mexican farmworkers admitted to the United States pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a) and employed by the various Defendants under temporary "H-2A" visas.

The H-2A Program[3]

The H-2A program was established as part of the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359 (codified as amended in scattered sections of 8 U.S.C.).  See U.S.C. § 1188. Under the H-2A program, a category of nonimmigrant foreign workers can be used for temporary agricultural employment within the United States.  See id.  Agricultural employers are permitted to hire nonimmigrant aliens as workers under the H-2A program if the Department of Labor ("DOL") first certifies that (1) there are insufficient domestic workers who are willing, able, and qualified to perform the work at the time and place needed; and (2) the employment of aliens will not adversely affect the wages and working conditions of domestic workers.  See id. §§ 1184(c)(1), 1188(a)(1).

The conditions under which an H-2A worker may be allowed into the United States for temporary agricultural employment are prescribed by the H-2A regulations. The H-2A regulations include provisions related to housing, meals, work-related equipment, and transportation.  For example, an employer seeking the services of H-2A workers must compensate them at a rate not less than the federal minimum wage, the prevailing wage rate in the area, or the "adverse effect wage rate," whichever is highest. See 20 C.F.R. § 655.102(b)(9).  The "adverse effect wage rate" is the minimum wage rate that the DOL determines is necessary to ensure that wages of similarly situated

---

briefing.  E.D. Cal. Local Rule 230(g).
[3] The following synopsis of the H-2A program is taken from Arriaga v. Fl. Pac. Farms, LLC, 305 F.3d 1228, 1232-33 (11th Cir. 2002).

1  domestic workers will not be adversely affected by the employment of H-2A workers.

2  See id. §§ 655.100(b), 655.107.  An employer must also pay an H-2A worker for inbound

3  transportation and subsistence costs, if the worker completes fifty percent of the contract

4  work period, unless the employer has previously done so.  See id. § 655.102(b)(5)(i).

5  Similarly, if the worker completes the contract work period, the employer is generally

6  responsible for the payment of outbound transportation and subsistence costs.  See id.

7  § 655.102(b)(5)(ii).

8      Vino's Version of the Facts[4]

9      On January 1, 2008, Vino Farms entered into a contract with SGLC entitled

10  "Agreement for Farm Labor Contracting Services" (hereinafter "the services contract").

11  Under the services contract, Vino engaged SGLC as an independent farm labor

12  contractor "to perform pruning, tying, training, suckering, harvesting, and various other

13  types of field work" on properties managed by Vino Farms.  The service contract

14  provided that SGLC is not an agent or employee of Vino.  The contract also stated that

15  "[p]ersons hired by [SGLC] shall be employees of [SGLC] alone and not employees of

16  [Vino]."  Finally, the contract provided that the "sole and exclusive control and

17  supervision of [Plaintiffs] with respect to their employment" belonged to SGLC.

18      On February 20, 2008, SGLC held a meeting with a number of the grower

19  Defendants, including Vino, to discuss SGLC's plan to apply for workers through the H-

20  2A program.  Julie Ball, the executive assistant to Vino's Executive Vice President and

21  shareholder Kim Ledbetter-Bronson, attended the meeting.  Vino contends that Ball did

22  not have the authority to speak on behalf of Vino or to authorize SGLC to act on Vino's

23  behalf; she simply attended the meeting to take notes and to report to Vino what SGLC

24  presented at the meeting.  At the meeting, and again after the meeting, Salvador

25  Gonzalez asked Vino to provide a letter of recommendation in support of SGLC's

26  application for H-2A workers.  On February 25, 2008, Vino provided SGLC with the

27  requested letter, which stated: "I am writing to give my full recommendation as it pertains

28  _____
[4] The following recitation of facts is taken from Vino's Statement of Undisputed Facts.  (ECF No. 168-2.)

1    to the H-2A certification request of Sal Gonzalez Labor Contractor. . . . Vino Farms, Inc.

2    gives their highest recommendation without reservation and supports Sal Gonzalez

3    Labor Contractor in their efforts to become H-2A certified."

4         SGLC acquired part of its workforce for the 2008 growing season by applying for,

5    recruiting, and hiring Plaintiffs from Colima, Mexico through the H-2A Program.  SGLC

6    hired approximately 178 workers through this program, including Plaintiffs.  Vino did not

7    apply for workers through the H-2A program, and did not assist SGLC with the

8    preparation of the H-2A application.  Vino did not give SGLC any input regarding how

9    many workers SGLC applied for in the H-2A application.  SGLC is the sole employer

10   listed on the H-2A application.

11        Salvador Gonzalez and his father, Julian Gonzalez, made a trip to Mexico to

12   inquire about recruiting workers for the H-2A program.  Vino farms contends that it did

13   not have a representative present on this trip.  Julian and Salvador made a return trip to

14   Mexico, to meet with the local governor and potential H-2A workers.  The SGLC

15   Defendants were accompanied by other grower Defendants on this trip, but no

16   representative from Vino went on the trip.  Plaintiffs were recruited and selected for

17   SGLC through a Mexican government agency referred to as "the CNC."

18        SGLC entered into an individual employment contract with each Plaintiff.  Vino

19   contends it was not a party to these contracts, and was not involved in preparing the

20   contracts or deciding the terms and conditions to be included.  Plaintiffs' wages, both

21   hourly and piece, were determined in the employment contracts between Plaintiffs and

22   SGLC.  Vino did not determine the hourly or piece wage rates that SGLC listed in the

23   contracts.  Rather, SGLC told Vino that SGLC was required to pay Plaintiffs certain

24   wages pursuant to H-2A regulations, and SGLC entered those wages into the contracts.

25        Similarly, the terms and conditions of Plaintiffs' transportation to California, and

26   reimbursement for transportation expenses, were part of the labor contracts between

27   SGLC and Plaintiffs.  SGLC alone provided Plaintiffs with transportation from Mexico to

28   California, and sent Julian Gonzalez to keep track of Plaintiffs' expenses incurred on the

4

1   trip.

2        Plaintiffs arrived in California on Thursday, July 17, 2008, and began working the

3   next day.  SGLC's workweek runs from Monday through Sunday.  None of Plaintiffs

4   began working on Vino's property until Tuesday, July 22, 2008, at the earliest.

5        The employment contracts between SGLC and Plaintiffs provided that "free

6   transportation will be provided from the housing location to the work site and return each

7   day."  SGLC provided transportation on buses solely owned and operated by SGLC, at

8   SGLC's expense.  Vino did not provide transportation.  Vino contends that neither Vino

9   nor SGLC required Plaintiffs to utilize the buses provided by SGLC to get to and from

10  work, and neither Defendant attempted to prohibit Plaintiffs from using other methods of

11  transportation.

12        Vino did not participate in training Plaintiffs, and did not have disciplinary authority

13  over Plaintiffs.  Vino did not supervise Plaintiffs or control their work activities; rather,

14  SGLC's foremen exclusively supervised Plaintiffs.  SGLC provided most, if not all, of

15  Plaintiffs work equipment.  Vino provided a tractor and equipment attached to the tractor,

16  which most Plaintiffs would not have used.  Vino did not determine what time Plaintiffs'

17  workday started or ended, and did not tell Plaintiffs when to take meal or rest breaks.

18  SGLC had the responsibility of telling Plaintiffs when to take meal and rest breaks when

19  they worked at an hourly rate.  When Plaintiffs worked at a piece rate, they individually

20  determined when to take their breaks.

21        Vino did not prepare Plaintiffs' payroll.  SGLC employees, not Vino, calculated

22  how much to pay Plaintiffs and prepared their paychecks and pay stubs.  Because

23  Plaintiffs were never able to produce a sufficient quantity to qualify for payment on a

24  piece rate basis, SGLC always paid Plaintiffs pursuant to the hourly rate specified in the

25  labor contracts.  SGLC tracked Plaintiffs' hours with "Daily Labor Sheets."  Vino did not

26  prepare any type of time sheet to keep track of Plaintiffs' hours.  The Daily Labor Sheets

27  were presented to Vino's Vineyard Manager who would briefly review the sheet, sign it,

28  and return it to the SGLC foreman.  This allowed the Vineyard Manager to verify that the

1  Daily Labor Sheet contained an accurate representation of the farm labor services that
2  SGLC had provided.

3      SGLC had the sole authority to terminate Plaintiffs.  Vino could not and did not
4  terminate any of the Plaintiffs.  Likewise, Vino did not recommend any of the Plaintiffs for
5  termination.

6      SGLC was entirely responsible for Plaintiffs' housing, pursuant to SGLC's contract
7  with Plaintiffs and the H-2A regulations.  Vino did not own, construct, operate, or
8  maintain any of the employee housing units where Plaintiffs were housed during the H-
9  2A period.  Labor Camp 17, where many Plaintiffs stayed, is located on Ranch 17.
10  Ranch 17 contained both vineyards and housing.  In 2008, SGLC operated and
11  maintained Camp 17, while Vino Farms managed the vineyards on Ranch 17.  In 2008,
12  Ranch 17 was owned by Silverado Premium Properties, an entity seperate from Vino.
13  SGLC was solely responsible for obtaining permits and repairing Labor Camp 17 so it
14  could pass inspection and meet H-2A housing standards.  The camp was inspected
15  several times by DOL representatives, at the request of SGLC.  SGLC provided the
16  mattresses, bed sheets, and bed covers for Camp 17.  Vino did not participate in the
17  process of readying housing for the H-2A workers, nor did Vino provide or pay for
18  supplies that contributed to making Camp 17 suitable for employee living.  SGLC
19  determined which workers would live at Camp 17.  Vino made no rules or regulations for
20  the workers living at Camp 17.

21      Vino did not provide food for Plaintiffs, and did not pay for or contribute to the
22  purchase of food for Plaintiffs.  SGLC provided the food for Plaintiffs.  Vino did not
23  charge Plaintiffs for meals they received.

24

25      Plaintiffs' Version of the Facts[5]

26      Vino and the other grower Defendants depended on the labor provided by SGLC.

27  _____

28  [5] The following recital of facts is taken from Plaintiffs' Statement of Undisputed Facts in Opposition to
Defendant Vino Farms, Inc.'s Motion for Summary Judgment.  (ECF No. 206-4.)

1   Vino had contracted with SGLC for approximately thirty years, and SGLC was Vino's
2   exclusive farm labor contractor.  Vino, and other growers in the Galt and Clarksburg
3   area, experienced difficulty finding sufficient labor in the 2007 growing season.  Vino,
4   along with three other grower Defendants, contracted with SGLC, Inc. for farm labor
5   during the 2008 growing season.  Recognizing the potential labor shortage that could
6   occur again in the 2008 growing season, SGLC proposed to the grower Defendants the
7   idea of applying for an H-2A permit, and recruiting temporary workers to come from
8   Mexico under H-2A visas.

9         The grower Defendants, including Julie Ball as a representative of Vino, met with
10   SGLC in late 2007 and/or early 2008.  At that meeting, the grower Defendants and
11   SGLC discussed the H-2A application, recruitment, transportation, housing, and hiring of
12   H-2A workers.  This meeting involved a discussion about the specific H-2A labor
13   certification requirements and penalties for violating the program's mandates.  The
14   meeting also included a discussion about the rates of pay for H-2A workers.  The grower
15   Defendants and SGLC agreed that SGLC would submit an application for temporary
16   workers from Mexico.

17         SGLC submitted its original H-2A application on April 9, 2008, seeking 200
18   workers for the period of May 1, 2008, through December 31, 2008.  On April 18, 2008,
19   SGLC was notified that the application did not meet the H-2A program requirements and
20   was not accepted for processing.  The notice to SGLC stated that SGLC needed to
21   "identify if they are the owners of the work locations or if they have contracts with the
22   field location owners.  If SGLC Inc. is acting as a [field labor contractor] they must
23   provide a copy of their [field labor contractor] certificate and the contractual agreements
24   between SGLC Inc. and the field owner . . . ."

25         On April 23, 2008, SGLC submitted a modified certificate to the DOL.  The
26   modified application that SGLC submitted included the "Agreement for Farm Labor
27   Contracting Services" between Vino and SGLC.  That contract states that SGLC was to
28   provide farm labor for work to be performed at various locations, including at least one

7

owned and operated by Vino, in the 2008 growing season.  The total amount of the contract was estimated to be $3.47 million.  Vino entered into the written contract with Salvador Gonzalez for the purpose of supporting SGLC's H-2A application.  Vino assumed that Salvador Gonzalez was going to use the contract between Vino and SGLC in its application for the H-2A permits.  Vino's Craig Ledbetter wrote a letter in support of SGLC's application for H-2A permits, stating "We look forward to the services of the H-2A program."  Vino's Craig Ledbetter also indicated that Vino would continue contracting with SGLC as long as SGLC could obtain H-2A workers.  On June 10, 2008, the DOL granted SGLC's certification for harvesting, pruning, general maintenance, and packing pears, grapes, apples, kiwis, and cherries.

According to Plaintiffs, SGLC and the grower Defendants, including Vino, agreed to recruit H-2A workers in Mexico.  Representatives of several other grower Defendants traveled with Salvador Gonzalez and Julian Gonzalez to Colima, Mexico, where they met with representatives of the government of Colima to ask for assistance in recruiting workers.  SGLC could not have enlisted the Colima government's help without first receiving authorization from the grower Defendants.  The grower Defendants gave SGLC this authorization.  SGLC and the grower Defendants recruited Plaintiffs by promising Plaintiffs work of forty hours per week for six months, earning at least one hundred dollars per day.

Although Vino did not send a representative to recruit workers in Mexico, it knew the trip occurred and that the trip was intended to recruit H-2A workers.  SGLC had multiple discussions with Vino about the need to bring in workers from Mexico, and Vino requested 150 workers from the H-2A program.  Defendants also agreed to allow Mexico's government to help recruit workers.  After the meeting with Mexican officials, Vino received an estimate as to when the workers would be available.  Furthermore, the United States Consulate in Mexico contacted Vino regarding their employment of H-2A workers.

Plaintiffs contend that as a result of Defendants' recruitment efforts, and the

approval of SGLC's H-2A applications, Plaintiffs were granted temporary visas to work in the United States, exclusively under the terms of the SGLC contract.

In early 2008, SGLC and the grower Defendants also discussed the need to have labor camps in order to abide by the H-2A program's requirements.  Upon arrival in the United States, some Plaintiffs were housed at Camp 17.  According to Plaintiffs, Vino owns Camp 17 and assigned its foreman, Mike Harder, to manage the camp.  Camp 17 was uninhabitable.  The toilets were backed up, the mattresses were soiled with blood and sweat, no laundry facilities existed, and there were exposed wires.  SGLC did not pay Vino for the use of Camp 17.

During a meeting held in 2008, SGLC and Defendants also discussed the means by which the workers would get to and from the fields.  This was an important consideration because the workers did not have their own transportation and did not know in advance where they would be working.  SGLC also specifically discussed billing Vino for all transportation costs.  Plaintiffs were not paid for the time that they waited for vans to pick them up in the morning and the travel time to the fields, altogether between 55 minutes and 100 minutes.  They were also not paid for the return trip after the shift, which could involve waiting up to two hours for the vans.

Often, Plaintiffs were either not given a rest period or received abbreviated breaks.  The meals lacked nutrition and were of poor quality.  Breakfast usually consisted of a bowl of beans and eggs with a cup of coffee.  Lunch was two flour tortillas with beans.  When it was provided, the evening meal contained meat and vegetables and a cup of coffee.  Furthermore, the water at Camp 17 was foul-smelling.

Vino's managers monitored the quality of all work and decided how much and which fruit would be picked each day.  This involved supervising multiple aspects of the agricultural process, notifying SGLC of any issues or problems, and deciding where the workers would go.  As a result, Vino determined when the work shifts would begin and end each day.  The managers were also charged with approving timesheets, and Vino made decisions regarding the method and amount of actual compensation.  Additionally,

9

1    Vino could decide how many workers it actually wanted in its fields.  Vino also provided

2    equipment such as "tipsters" to Plaintiffs.

3         While in California, Plaintiffs experienced a lack of work and lower wages than

4    Plaintiffs believed they would receive based on the representations Plaintiffs contend

5    SGLC made to Plaintiffs in Mexico.  Defendants failed to provide compensation for all

6    hours worked.  In deciding to come to the United States, Plaintiffs had relied on

7    Defendants' promises that they would be paid one hundred dollars per day, and work

8    forty hours per week for six months.  Plaintiffs therefore returned to Mexico before the

9    six-month work period had ended.

10                              **STANDARD**

11

12        Rule 56 provides for summary judgment when "the pleadings, depositions,

13   answers to interrogatories, and admissions on file, together with affidavits, if any, show

14   that there is no genuine issue as to any material fact and that the moving party is entitled

15   to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477

16   U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually

17   unsupported claims or defenses.  Celotex, 477 U.S. at 325.

18        Rule 56 also allows a court to grant summary adjudication on part of a claim or

19   defense.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment,

20   identifying . . . the part of each claim or defense . . . on which summary judgment is

21   sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal.

22   1995); France Stone Co., Inc. v. Charter Twp. of Monroe, 790 F. Supp. 707, 710 (E.D.

23   Mich. 1992).

24        The standard that applies to a motion for summary adjudication is the same as

25   that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a), 56(c);

26   Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

27        Under summary judgment practice, the moving party always bears the
     initial responsibility of informing the district court of the basis for its motion,
28   and identifying those portions of 'the pleadings, depositions, answers to

                                      10

1
2

> interrogatories, and admissions on file together with the affidavits, if any,'
> which it believes demonstrate the absence of a genuine issue of material
> fact.

Celotex, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

3

4          If the moving party meets its initial responsibility, the burden then shifts to the

5   opposing party to establish that a genuine issue as to any material fact actually does

6   exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986);

    First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

7

8          In attempting to establish the existence of this factual dispute, the opposing party

9   must tender evidence of specific facts in the form of affidavits, and/or admissible

10  discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P.

11  56(e).  The opposing party must demonstrate that the fact in contention is material, i.e., a

12  fact that might affect the outcome of the suit under the governing law, and that the

13  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

14  for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52

15  (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347,

16  355 (9th Cir. 1987).  Stated another way, "before the evidence is left to the jury, there is

17  a preliminary question for the judge, not whether there is literally no evidence, but

18  whether there is any upon which a jury could properly proceed to find a verdict for the

19  party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251

20  (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)).  As the Supreme Court

21  explained, "[w]hen the moving party has carried its burden under Rule 56(c), its

22  opponent must do more than simply show that there is some metaphysical doubt as to

23  the material facts . . . . Where the record taken as a whole could not lead a rational trier

24  of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita,

    475 U.S. at 586-87.

25

26         In resolving a summary judgment motion, the evidence of the opposing party is to

27  be believed, and all reasonable inferences that may be drawn from the facts placed

28  before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

obligation to produce a factual predicate from which the inference may be drawn.

Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

**A.    FLSA**

Joint Employment under the FLSA

Congress passed the Fair Labor Standards Act ("FLSA") intending to "correct and

eliminate those 'conditions detrimental to the maintenance of the minimum standard of

living necessary for health, efficiency, and general wellbeing of workers."  Torres-Lopez

v. May, 111 F.3d 633, 638 (9th Cir. 1997) (citing 29 U.S.C. § 202(a)).  The FLSA

established a minimum wage; regulations concerning "maximum hours"; recordkeeping

and reporting requirements; child labor provisions; and a system of civil and criminal

penalties for violations.  See generally 29 U.S.C. §§ 201-219.  In 1966, Congress

amended the FLSA to extend minimum wage protections to some agricultural workers.

See S. Rep. No. 89-1487 (1966).

Pursuant to 29 U.S.C. § 216(b), employees may only seek redress from

"employers."  "The FLSA broadly defines the 'employer-employee relationship[s]' subject

to its reach."  Torres-Lopez, 111 F.3d at 638.  Under the FLSA, to "employ" is defined as

"includ[ing] to suffer or permit to work."  29 U.S.C. § 203(g).  "The FLSA's definition of

employee has been called the 'broadest definition that has ever been included in any

one act.'"  United States v. Rosenwasser, 323 U.S. 360, 363 n.3 (1945); see also

Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992) (noting the "striking

breadth" of the "suffer or permit" definition).  The Ninth Circuit, among others, has held

that "employees" include those workers "who as a matter of economic reality are

dependent upon the business to which they render service."  Real v. Driscoll Strawberry

12

1  Assocs., Inc., 603 F.2d 748, 754 (9th Cir. 1979); see also Charles v. Burton, 169 F.3d

2  1322, 1328 (11th Cir. 1999) (finding that a business entity employs an individual when

3  the economic reality is such that the individual depends on the entity); Sec'y of Labor v.

4  Lauritzen, 835 F.2d 1529, 1538 (7th Cir. 1987) (holding that the degree to which the

5  alleged employee depends on the particular business determines employee status).

6       Employees can have more than one employer under the FLSA, and "joint

7  employers" are each individually liable for FLSA violations.  Torres-Lopez, 111 F.3d at

8  638 (citing 29 C.F.R. § 791.2(a) ("A single individual may stand in the relation of an

9  employee to two or more employers at the same time . . . .")).  The question of joint

10  employment is a question of law.  Bonnette v. Cal. Health & Welfare Agency, 704 F.2d

11  1465 (9th Cir. 1983); Torres-Lopez, 111 F.3d at 638.  The Ninth Circuit "has recognized

12  that the concept of joint employment should be defined expansively under the FLSA" in

13  order to effectuate the FLSA's broad remedial purposes.  Torres-Lopez, 111 F.3d at 639

14  (citing Real, 603 F.2d at 754 ("Courts have adopted an expansive interpretation of the

15  definitions of 'employer' and 'employee' under the FLSA, in order to effectuate the broad

16  remedial purposes of the Act.")).

17       Courts also employ an "economic realities" test to determine whether a joint

18  employment relationship existed.  Real, 603 F.2d at 754; Bonnette, 704 F.2d at 1470;

19  Torres-Lopez, 111 F.3d at 639.  The economic reality test seeks to ascertain whether the

20  employee in question is economically dependent on the alleged employer.  See Torres-

21  Lopez, 111 F.3d at 641.  Where the worker is "economically dependent" upon an alleged

22  employer and the alleged employer "exercised control" over the workers, an employer-

23  employee relationship will be found.  Id. at 644.  However, under this test, no single

24  factor is determinative.  Donovan v. Sureway Cleaners, Inc., 656 F.2d 1368, 1370 (9th

25  Cir. 1981) ("Neither the presence nor absence of any individual factor is determinative.").

26  "Whether an employee-employer relationship exists depends on the circumstances of

27  the whole activity."  Real, 603 F.2d at 754.

28       Courts have used various regulatory and non-regulatory factors to determine

13

1   whether a joint employment relationship exists.  See Zhao v. Bebe Stores, Inc., 247 F.

2   Supp. 2d 1154, 1157 (C.D. Cal. 2003) ("The Ninth Circuit has, at various times, identified

3   different factors as relevant to the test of whether an employment relationship exists for

4   purposes of the FLSA.").  Five regulatory factors, taken from the Migrant and Seasonal

5   Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801-1872, are: (1) the

6   nature and degree of control of the workers; (2) the degree of supervision, direct or

7   indirect, of the work; (3) the power to determine pay rates or methods of payment of the

8   workers; (4) the right, directly or indirectly, to hire, fire, or modify employment conditions

9   of the workers, and (5) the preparation of payroll and the payment of wages.  29 C.F.R.

10  § 500.20(h)(5)(iv).  The "regulatory factors relate to whether an alleged joint employer

11  exerts control over workers and their wages."  Torres-Lopez, 111 F.3d at 636.

12       The eight non-regulatory factors used by the Ninth Circuit are: (1) whether the

13  work was a "specialty job on the production line;" (2) whether responsibility under the

14  contracts between a labor contractor and an employer pass from one labor contractor to

15  another without "material changes;" (3) whether the "premises and equipment" of the

16  employer are used for the work; (4) whether the employees had a "business organization

17  that could or did shift as a unit from one [worksite] to another;" (5) whether the work was

18  "piecework" and not work that required "initiative, judgment or foresight;" (6) whether the

19  employee had an "opportunity for profit or loss depending upon [the alleged employee's]

20  managerial skill;" (7) whether there was "permanence [in] the working relationship;" and

21  (8) whether "the service rendered is an integral part of the alleged employer's business."

22  Torres-Lopez, 111 F.3d at 640 (internal citations omitted).  These eight factors are

23  derived from the AWPA.  Maddock v. KB Homes, Inc., 631 F. Supp. 1226, 1233 (C.D.

24  Cal. 2007).  The non-regulatory factors "relate to whether a farmworker is economically

25  dependent on the alleged joint employer."  Id.

26       The Ninth Circuit has indicated that under its version of the test, a court is to

27  consider those factors that are "relevant to the particular situation" when evaluating a

28  potential joint employer relationship.  Id. at 639 (quoting Bonnette, 704 F.2d at 1470).

14

1   Furthermore, a farm labor contractor and a grower may have a joint employment

2   relationship where:

3         (1) they have an agreement to share the worker's services, such as to
          interchange employees; (2) where the farm labor contractor acts "directly

4         or indirectly in the interest of the other employer;" or (3) the grower and
          farm labor contractor "may be deemed to share control of the employee,

5         directly, or indirectly, by reason of the fact that one employer controls, is
          controlled by, or is under common control with the other employer.

6

7         Rosales v. El Rancho Farms, 1:09-CV-00707-AWI, 2011 WL 6153276 (E.D. Cal.

8   Dec. 12, 2011), report and recommendation adopted, 1:09-CV-00707-AWI, 2012 WL

9   292977 (E.D. Cal. Jan. 31, 2012) (quoting 29 C.F.R. § 791.2(b)).

10        Vino generally contends that it did not jointly employ Plaintiffs.  However, Vino has

11  not met its burden of demonstrating to the Court that Plaintiffs have failed to put forward

12  evidence in support of their claim of joint employment under the FLSA.  When the

13  nonmoving party has the burden of proof at trial, the moving party only needs to show

14  "that there is an absence of evidence to support the nonmoving party's case."  Celotex

15  Corp., 477 U.S. at 325.  Vino has failed to show such an absence of evidence supporting

16  Plaintiffs' case for joint employment as to Plaintiffs who worked on Vino's property.

17        Vino also states that it is undisputed that three named Plaintiffs never worked on

18  Vino's property.  (ECF No. 168-1.)  While Plaintiffs contend that one of those Plaintiffs,

19  Rogelio Lopez Llamas, did in fact work on Vino's property (ECF No. 206-3 at 138), it is

20  undisputed that named Plaintiffs Joel Gonzalez Avila and Francisco Ceja Sandoval did

21  not work on Vino's property.[6]  The Court now finds that, as a matter of law, Plaintiffs that

22  performed no work for Vino were not "jointly employed" by Vino, as that term is used in

23  the FLSA.

24        "[I]n any case of statutory construction, our analysis begins with 'the language of

25  the statute.'"  Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999) (quoting Estate

26  of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992)).  "And where the statutory

27  _____

28  [6] Vino also contends that two opt-in Plaintiffs never worked on Vino's property.  This issue is now moot, as
    the opt-in Plaintiffs are dismissed pursuant to the Court's order issued this same day.  (ECF No. 308.)

                                            15

1   language provides a clear answer, it ends there as well." Id. (citing Conn. Nat. Bank v.

2   Germain, 503 U.S. 249 (1992)).  The statute at issue here, 29 U.S.C. § 216(b) states, in

3   pertinent part: "Any *employer* who violates the provisions of section 206 or section 207

4   shall be liable to the *employee* or *employees* affected in the amount of their unpaid

5   minimum wages, or their unpaid overtime compensation, as the case may be . . . ."

6   (emphasis added).  Congress chose to define "employee" as "any individual employed

7   by an employer."  29 U.S.C. § 203(e)(1).  An "employer includes any person acting

8   directly or indirectly in the interest of an employer in relation to an employee."  Id.

9   § 203(d).  For an individual to be "employed" by an "employer," that individual must be

10  "suffer[ed] or permit[ted] to work."  Id. § 203(g).  "Work," the Supreme Court has held, "is

11  physical or mental exertion (whether burdensome or not) controlled or required by the

12  employer and pursued necessarily and primarily for the benefit of the employer."  Alvarez

13  v. IBP, Inc., 339 F.3d 894, 902 (9th Cir. 2003), aff'd, 546 U.S. 21 (2005) (citing Tenn.

14  Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1940)).  Furthermore,

15  Black's Law Dictionary defines "work" as "physical and mental exertion to attain an end,

16  especially as controlled by and for the benefit of an employer; labor."  Black's Law

17  Dictionary 1742 (2009).

18          In this case, Plaintiffs that did not perform any work for Vino were simply never

19  "suffered or permitted" to work for Vino.  Cf. Dellinger v. Science Applications Intern.

20  Corp., No. 1:10cv25(JCC), 2010 WL 1375263, at *3, aff'd, 649 F.3d 226 (4th Cir. 2011)

21  (finding prospective employee's FLSA claim failed because she was not suffered or

22  permitted to work).  While the provisions of the FLSA must be construed broadly, in light

23  of the Act's remedial purposes, Torres-Lopez, 111 F.3d at 639, the Court is aware of no

24  case holding that the FLSA's definition of "employee" includes those individuals who

25  have never performed work for the alleged employer.  Quite simply, while "[t]he FLSA

26  broadly defines the 'employer-employee relationship[s]' subject to its reach," Torres-

27  Lopez, 111 F.3d at 638, an employee must nonetheless be "suffer[ed] or permit[ted]" to

28  work, 29 U.S.C. § 203(g).  That is, the employee must physically or mentally exert

16

1   himself, or labor in some way.  See Alvarez, 339 F.3d at 902; Black's Law Dictionary

2   1742.  Here, there is no evidence that Plaintiffs Joel Gonzalez Avila and Francisco Ceja

3   Sandoval were ever "suffered or permitted" to "work" by Vino, as defined by the Supreme

4   Court.

5         The Court's holding is consistent with the Ninth Circuit's multi-factor test for

6   determining whether a joint employment relationship exists.  Under the first of the five

7   regulatory factors, an alleged employer has no degree of control over a "worker" that

8   does no work on his property.  29 C.F.R. § 500.20(h)(4)(i).  Second, the nature of an

9   "employer's" supervision is non-existent over an "employee" that performs no work for

10   the employer.  Id. § 500.20(h)(4)(ii).  Third, the employer has no power to determine pay

11   rates or methods of payment of a "worker" that performs no work for him, except to the

12   extent that the employer determines that such a person will not be paid because that

13   person has performed no work to be paid for.  Id. § 500.20(h)(4)(iii).  Fourth, the right to

14   hire, fire, or modify employment conditions of such alleged "workers" exists only to the

15   extent that an "employer" may choose to hire an "employee" who has not previously

16   been "suffered or permitted to work" for him.  Id. § 500.20(h)(4)(iv).  However, it borders

17   on nonsensical to say that an "employer" can modify the employment conditions of an

18   "employee" when that employee is not being suffered or permitted to work in the first

19   place.  Fifth, the employer is not involved in the preparation of payroll and the payment

20   of wages to a person that is not suffered or permitted to work, as that person receives no

21   payment of wages.  Id. § 500.20(h)(4)(v).  Thus, none of the regulatory factors suggest

22   that a joint employment relationship exists when the alleged employee is not "suffered or

23   permitted to work."  This result is consistent with the question the regulatory factors are

24   designed to examine: whether the alleged employer exerts control over the alleged

25   employee.  Torres-Lopez, 111 F.3d at 636 (The "regulatory factors relate to whether an

26   alleged joint employer exerts control over workers and their wages.").  An alleged

27   employer clearly exerts no control over those individuals who perform no "work" for him.

28         Analysis of the Ninth Circuit's eight non-regulatory factors reaches a similar result.

17

See Torres-Lopez, 111 F.3d at 640.  First, when no "work" is performed, there certainly

cannot be a "specialty" job.  When there is no "work," performed at all, there is no work

for the alleged worker to specialize in.  Second, if there is no employment contract, there

is no employment contract to pass to another employer.   Third, if no work is performed,

no premises or equipment is used.  Fourth, employees cannot organize a business

organization to move to another worksite when they are not employed or organized at an

already existing worksite.  Fifth, work can be neither be characterized as "piecework" nor

work that requires "initiative, judgment, or foresight" if there is no "work."  Sixth, an

employee has no opportunity for profit or loss when the "employee" is not "suffered or

permitted to work."  Seventh, there can be no permanence in a working relationship

when no working relationship exists.  Finally, a non-existent service cannot possibly be

vital to the alleged employer's business.  Thus, the non-regulatory factors for an alleged

"employee" who performs no "work" for the alleged "employer" necessitates finding that

there is no joint employment relationship, as an individual cannot be economically

dependent on an alleged joint employer when he performs no work for that employer.

See Maddock, 631 F. Supp. at 1233 (stating that the eight non-regulatory factors are

designed to assess whether the alleged employee is economically dependent on the

alleged joint employer).

        Indeed, the regulatory factors suggest that the "economic reality" for an alleged

employee who performs no work for an employer is that the alleged employer exercises

no control over the alleged employee, and the alleged employee has no economic

dependence on the alleged joint employer.  See Real, 603 F.2d at 754 (employing an

"economic realities" test to determine whether a joint employment relationship existed);

Bonnette, 704 F.2d at 1470 (same); Torres-Lopez, 111 F.3d at 639 (same).  The Court is

bound by the joint employer analysis of the Ninth Circuit, and the plain language of the

FLSA.  As such, the Court holds that when a plaintiff is not "suffered or permitted to

work" by the alleged employer-defendant, the plaintiff is not an "employee" and the

defendant is not an "employer" within the meaning of the FLSA.  Accordingly, Vino's

1    motion for summary judgment on the FLSA claim is granted as to Plaintiffs Joel

2    Gonzalez Avila and Francisco Ceja Sandoval, who undisputedly performed no work for

3    Vino.

4         De Facto Deduction Claim

5         Plaintiffs allege that Vino, among other Defendants, "failed to reimburse

6    transportation, visa, and recruitment fees" in the first week of work, which resulted in

7    Plaintiffs being paid less than minimum wage during their first work week.  (ECF No. 67

8    at 10.)  Vino moves for summary judgment as to Plaintiffs' "de facto deduction" FLSA

9    claim on the ground that no Plaintiffs worked on Vino's property during the workweek in

10   which Plaintiffs incurred their travel expenses.  Vino further argues that even if it was a

11   joint employer while Plaintiffs worked on Vino's properties, it was not a joint employer

12   during Plaintiffs' first workweek.

13        The FLSA's minimum wage provisions apply to Plaintiffs.  See 20 C.F.R.

14   § 655.103(b) ("During the period for which the temporary alien agricultural labor

15   certification is granted, the employer shall comply with applicable federal, state, and local

16   employment-related laws and regulations . . . .").  Employers must provide workers

17   weekly wages "free and clear" of improper deductions, at a rate no lower than the

18   minimum wage rate.  29 U.S.C. § 206(a)(1); 29 C.F.R. §§ 531.35, 776.4.  In order to

19   ensure that pre-employment expenses do not operate as de facto deductions, "[w]orkers

20   must be reimbursed during the first workweek for pre-employment expenses which

21   primarily benefit the employer, to the point that wages are at least equivalent to the

22   minimum wage." Arriaga v. Fl. Pac. Farms, LLC, 305 F.3d 1228, 1237 (11th Cir. 2002)

23   (citing Marshall v. Root's Rest., 667 F.2d 559, 560 (6th Cir. 1982)).  "Compliance with

24   the FLSA is measured by the workweek," and the employer must reimburse inbound

25   travel expenses "during the workweek in which the expense arose." Id.  One-time

26   transportation costs for workers under the H-2A program are "an incident of and

27   necessary to the employment of H-2A workers." Id. at 1242.  "Transportation costs are

28   an inevitable and inescapable consequence of having foreign H-2A workers employed in

19

1     the United States; these are costs which arise out of the employment of H-2A workers."

2     Id.  Likewise, visa costs and visa application fees are expenses that primarily benefit the

3     employer and are to be reimbursed in the first workweek "up to the point where the

4     minimum wage is met."  Id. at 1244.

5          Vino argues that Plaintiffs did not work for Vino in the "workweek" in which the

6     transportation expenses arose—namely, Plaintiffs' first workweek.  Vino contends that it

7     is undisputed that SGLC's established workweek ran from Monday through Sunday, and

8     Plaintiffs started working for SGLC on Friday, July 18, 2008.  Thus, Vino argues, the

9     workweek ended on Sunday, July 20, 2008.[7]  (ECF No. 241 at 7.)  Plaintiffs did not begin

10    working for Vino until on or after Tuesday, July 22, 2008.  Plaintiffs argue that they

11    worked for Vino five days after their arrival in the United States, and therefore within one

12    week.  Essentially, Plaintiffs argue that a workweek is any continuous seven day period.

13    Plaintiffs further argue that even if Plaintiffs did not work for Vino within the first

14    "workweek," Vino is nonetheless liable to Plaintiffs due to Vino's concerted actions with

15    other Defendants.  (ECF No. 206 at 17.)

16         "'Workweek' is defined under the FLSA . . . as 'a fixed and regularly recurring

17    period of 168 hours—seven consecutive 24–hour periods.'"  Seymore v. Metson Marine,

18    Inc., 194 Cal. App. 4th 361, 368 (2011) (citing 18 29 C.F.R. § 778.105).  A workweek

19    "need not coincide with the calendar week but may begin on any day and at any hour of

20    the day."  29 C.F.R. § 778.105.  Vino offers evidence that SGLC's workweek ran from

21    Monday through Sunday.  (ECF No. 173 at 5.)  Plaintiffs do not dispute this fact.  (ECF

22    No. 206-3 at 57.)  Vino also offers evidence that Plaintiffs arrived in California on

23    Thursday, July 17, 2008, and began working the next day.  (ECF No. 173 at 5.)  Plaintiffs

24    do not dispute this fact either.  (ECF No. 206-3 at 57.)  Finally, Vino offers evidence that

25    Plaintiffs did not began working on Vino's property until on or after Tuesday, July 22,

26    2008, (ECF No. 173 at 5), which Plaintiffs do not dispute.

27    _____

28    [7] While Vino states that the date was Sunday, July 21, 2008, reference to a 2008 calendar reveals that the
      relevant dates are as follows:  Friday, July 18, 2008; Sunday, July 20, 2008; Tuesday, July 22, 2008.

1  Thus, the Court finds that the Plaintiffs' "workweek," as the FLSA uses the term,

2  was from Monday through Sunday.  Given that this fact is undisputed, summary

3  judgment is appropriate on this issue.  Because Vino did not employ Plaintiffs during

4  their first "workweek," the Court grants Vino's motion for summary judgment as to

5  Plaintiffs' claim for de facto deductions during the first workweek, as alleged in Plaintiffs'

6  first cause of action.

7  Moreover, the Court rejects Plaintiffs' argument that due to Vino's status as a joint

8  employer, Vino is liable under the FLSA regardless of whether Plaintiffs worked on

9  Vino's property during the first workweek.  While joint employers may be liable under the

10  FLSA for the actions of their joint employer, Vino Farms was not a joint employer of

11  Plaintiffs when Plaintiffs were not working on their property.  See supra.  As noted

12  above, "[e]mploy" means "to suffer or to permit to work" under the FLSA.  29 U.S.C. §

13  203(g).  Prior to July 22, 2008, no Plaintiffs had been suffered or permitted to work on

14  Vino's property.  Accordingly, Vino was not a joint employer of Plaintiffs during the first

15  workweek, and is not liable for the alleged de facto deductions that occurred during that

16  time.

17  Travel Time under the Portal-to-Portal Act

18  Plaintiffs also claim that Vino violated the FLSA by failing to compensate them for

19  the time spent traveling to and from their work locations.  Vino contends that Plaintiffs'

20  travel time claim fails under the Portal-to-Portal Act, 29 U.S.C. § 254, which generally

21  provides that an employer cannot be held liable for time spent traveling to and from the

22  work site.  (ECF No. 168-1 at 4.)  In response, Plaintiffs argue that they had no option

23  but to use the buses provided by Defendants because they did not have alternative

24  means of transportation to get to work, and Plaintiffs did not know where they would be

25  working in advance.  Thus, Plaintiffs claim their time is compensable under Morillion v.

26  Royal Packing, 22 Cal. 4th 575 (2000).  (ECF No. 206 at 18-19.)  Plaintiffs also assert

27  that "Vino's argument that under the FLSA, 'Portal to Portal' bus transportation between

28  the H-2A workers' housing location and Vino work area is also equally trumped by the

1    California Supreme Court's decision in <u>Morillion.</u>"  (ECF No. 206 at 19.)

2              "The Portal-to-Portal Act was enacted in 1947 to make clear that the FLSA did

3    not cover ordinary commuting time."  <u>Wren v. RGIS Inventory Specialists</u>, No. C-06-

4    05778 JCS, 2009 WL 2612307, at *5 (N.D. Cal. Aug. 24, 2009) (citing <u>Imada v. City of</u>

5    <u>Hercules</u>, 138 F.3d 1294, 1296) (9th Cir. 1998)).  More specifically, employers do not

6    need to compensate employees for "walking, riding, or traveling to and from the actual

7    place of performance of the principal activity or activities which such employee is

8    employed to perform" or for "activities which are preliminary to or postliminary to said

9    principal activity or activities, which occur either prior to the time on any particular

10   workday at which such employee commences, or subsequent to the time on any

11   particular workday at which he ceases, such principal activity or activities."  29 U.S.C.

12   § 254(a).  However, the Portal-to-Portal Act carves out exceptions, and provides that

13   employers may be liable for compensation in two situations: (1) if there is an express

14   provision in a written or verbal contract; or (2) there is a custom in effect at the time of

15   the activity between the employee and the employer.  29 U.S.C. § 254(b).

16             Federal regulations implementing the FLSA state that under the Portal-to-Portal

17   Act, whether an employee works at a "fixed location" or "different job sites," "[a]n

18   employee who travels from home before his regular workday and returns to his home at

19   the end of the workday is engaged in ordinary home to work travel which is a normal

20   incident of employment."  29 C.F.R. § 785.35.  "Under this regulation, this time is not

21   'worktime' and therefore, is not compensable."  <u>Wren</u>, 2009 WL 2612307, at *6 (citing 29

22   C.F.R. § 785.35). "This rule applies even where employees travel together to a work site,

23   either in an employee's vehicle or a company-owned vehicle, unless the employees are

24   performing activities that are integral to their principal activities while en route to the work

25   site."  <u>Id.</u> (citing <u>Smith v. Aztec Well Servicing Co.</u>, 462 F.3d 1274, 1288 (10th Cir.

26   2006)).

27             On the other hand, "travel that is an indispensable part of performing one's job is

28   a principal activity and is compensable."  <u>Vega v. Gasper</u>, 26 F.3d 417, 424 (5th Cir.

1   1994).  Likewise, "where an employee is required to report to a designated meeting

2   place to receive instructions before he proceeds to another workplace (such as the

3   jobsites), the start of the workday is triggered at the designated meeting place, and

4   subsequent travel is part of the day's work and must be counted as hours worked for

5   purposes of the FLSA . . . ."  Id. at 425 (internal citations and quotations omitted).

6       Vino cites to Rutti v. Lojack Corp., Inc. in support of its argument that "use of an

7   employers' vehicle to commute is not compensable even if it is a condition of

8   employment."  596 F.3d 1046, 1051 (9th Cir. 2010).  In Rutti, the plaintiff sought to bring

9   a class action on behalf of all technicians who installed alarms in customers' cars.  As a

10  technician, Rutti was required to travel to job sites in a company-owned vehicle.  Id. at

11  1049.  Rutti sought compensation for the time spent commuting to worksites on the

12  ground that his use of the employer's vehicle amounted to a condition of his

13  employment.  Id. at 1051.  The Ninth Circuit rejected Rutti's argument, stating that the

14  plain language of 29 U.S.C. § 254(a)(2) mandated that where the use of an employer's

15  vehicle "'is subject to an agreement on the part of the employer and the employee,' it is

16  not part of the employee's principle activities and thus not compensable."  Id. at 1052.

17  Under Rutti, it is clear that an employee's use of the vehicle must be "subject to an

18  agreement on the part of the employee and the employer" in order for the time spent

19  commuting to be noncompensable under the Portal-to-Portal Act.  596 F.3d at 1052

20  (quoting 29 U.S.C. § 254(a)).  However, under federal law, "there is no suggestion that

21  the agreement cannot be a condition of employment."  Id.

22       Plaintiffs cite to Morillion to support their argument that Plaintiffs are entitled to

23  compensation for their travel time under the FLSA.  (ECF No. 206 at 18.)  Plaintiffs argue

24  that the Portal-to-Portal Act's application to the FLSA is "trumped" by Morillion.  This

25  argument fails.  Morillion addressed "whether an employer was required to compensate

26  field workers for time spent traveling to and from the fields on company buses, where the

27  use of the buses was compulsory.  Specifically, the [C]ourt addressed whether this time

28  constituted 'hours worked' under the applicable Industrial Welfare Commission ("IWC")

1    wage order." <u>Wren</u>, 2009 WL 2612307, at *9 (citing <u>Morillion</u>, 22 Cal. 4th at 578).

2    Contrary to Plaintiffs' assertion, the <u>Morillion</u> Court merely found that federal authority,

3    including cases interpreting the Portal-to-Portal Act, were not persuasive in interpreting

4    California's IWC. <u>See Morillion</u>, 22 Cal. 4th at 592. The Court thus found that California

5    state law provided greater protections than federal law under the Portal-to-Portal Act. <u>Id.</u>

6         In the present case, there is a genuine issue of material fact as to whether there

7    was an agreement between Plaintiffs and Vino and/or SGLC regarding Plaintiffs'

8    transportation on SGLC's busses. Vino offers evidence that the Labor Contract provided

9    by SGLC to Plaintiffs stated "Free transportation will be provided from the housing

10    location to the work site and return each day," (ECF No. 168-2 at 7), and Plaintiffs do not

11    dispute this fact (ECF No. 206-3 at 61). However, Vino does not contend this

12    contractual language is the requisite "agreement." (<u>See</u> ECF No. 168 at 11.) Rather,

13    Vino offers this language as evidence that Plaintiffs were not required to use the

14    transportation that SGLC provided. (<u>Id.</u>) Without the undisputed fact of an agreement

15    regarding Plaintiffs' transportation on either Vino or SGLC's vehicle, the Court cannot

16    grant summary judgment for Vino. Accordingly, Vino's motion for summary judgment is

17    denied as to Plaintiffs' claim for travel time under the FLSA.

18        **B.**     **Breach of Contract**

19

20         Plaintiffs allege that Vino breached its work contracts with Plaintiffs in 2008 by

21    violating numerous state and federal laws. (ECF No. 67 at 9-10.) Plaintiffs allege that

22    as a result of Vino's breach, Plaintiffs were forced to terminate their employment prior to

23    the end of the contract period. (<u>Id.</u> at 10.) As a result, Plaintiffs claim, they suffered

24    consequential damages including lost pay and the lost payment of unreimbursed

25    expenses. (<u>Id.</u>) Although it is not clearly stated by Plaintiffs, the Court construes

26    Plaintiffs' argument that Defendants "acted in concert" as asserting an agency theory to

27    support their breach of contract action. (<u>Cf.</u> Pls.' Opp'n to Def. Islands' MSJ, ECF No.

28    159 at 14 (arguing evidence of an agency relationship between Islands and SGLC).)

1   "To be entitled to damages for breach of contract, a plaintiff must plead and prove

2   the following elements: (1) the existence of a contract, (2) plaintiff's performance or

3   excuse for nonperformance, (3) defendant's breach, and (4) resulting damage to the

4   plaintiff."  Reinhardt v. Gemini Motor Transp., 1:11-CV-1944 AWI SMS, 2012 WL

5   1435008 (E.D. Cal. Apr. 25, 2012) (quoting Oasis West Realty, LLC v. Goldman, 51 Cal.

6   4th 811, 821 (2011)).  Vino contends that Plaintiffs have failed to demonstrate the

7   existence of a contract between Islands and Plaintiffs.  (ECF No. 168 at 13.)  Vino

8   contends that because Plaintiffs have put forth no facts establishing that such an

9   agreement existed, Vino is entitled to summary judgment on that claim.  (Id.)

10   The Court understands Plaintiffs to argue that Vino is bound by the employment

11   contract between SGLC and Plaintiffs, pursuant to an agency or representative liability

12   theory.  "A representative is '[o]ne who stands for or acts on behalf of another."  Borders

13   Online, LLC v. State Bd. of Equalization, 129 Cal. App. 4th 1179, 1189 (2005) (quoting

14   Black's Law Dictionary 1304 (7th ed. 1999)).  "An agent is one who represents another,

15   called the principal, in dealings with third persons."  Id. (quoting Cal. Civ. Code § 2295).

16   "The relation of agency need not depend upon express appointment and acceptance

17   thereof, but it may be, and frequently is, implied from the words and conduct of the

18   parties and the circumstances of the particular case."  Smith v. Schuttpelz, 1 Cal. 2d

19   158, 161 (1934); see also Borders Online, LLC, 129 Cal. App. 4th at 1189 ("An agency

20   relationship may be implied based on conduct and circumstances."); Thayer v. Pac.

21   Elec. Ry. Co., 55 Cal. 2d 430, 438 (1940) ("The existence of an agency is a question of

22   fact which may be implied from the conduct of the parties.") (internal citations omitted).

23   When an agent acts on behalf of an undisclosed principal, the unidentified principal

24   becomes a party to the contract.  Restatement (Third) of Agency: Agent for Undisclosed

25   Principal §§ 6.02, 6.03 (2006).  The agent who makes a contract on behalf of an

26   undisclosed principal is also a party to the contract.  Id.  The principal and the third party

27   have the same rights, liabilities, and defenses against each other as if the principal made

28   the contract personally . . . ."  Id. § 6.03.  The existence of an agency relationship is a

1    question of fact.  <u>Thayer</u>, 55 Cal. 2d at 438.

2             In the present case, viewing the facts in the light most favorable to Plaintiffs,

3    Plaintiffs have put forward facts that suggest an implied agency relationship between

4    SGLC and Vino.  For example, Vino exclusively used SGLC to fill its labor needs (ECF

5    No. 212-1 at 4), and signed a contract with SGLC on January 1, 2008, for farm labor

6    during the 2008 growing season (ECF No. 168-3 at 2).  The grower Defendants had

7    experienced a labor shortage and were having difficulty finding the necessary labor (ECF

8    No. 211-4 at 7-9), and thus SGLC proposed—and the growers agreed—that H-2A

9    workers should be recruited. (ECF No. 211-2 at 7).  Plaintiffs offer evidence suggesting

10   that the contract was needed for the H-2A application to be approved.  (ECF No. 211-9

11   at 23.)  It is undisputed that Vino's Craig Ledbetter wrote a letter to DOL in support of

12   SGLC's H-2A application, at the request of SGLC, recommending SGLC for the H-2A

13   program.  (ECF No. 212-1 at 17; ECF No. 173 at 4, Ex. B.)  When Vino sent the letter in

14   support of SGLC's application, Vino was aware that the H-2A workers would be working

15   on their property.  (ECF No. 212-1 at 17.)  Plaintiffs offer evidence that Vino met with the

16   SGLC Defendants and other grower Defendants to discuss the details of applying for the

17   H-2A program and recruiting H-2A workers.  (ECF Nos. 211-4, 211-5.)  Plaintiffs also

18   offer evidence suggesting that the grower Defendants, including Vino, authorized

19   Salvador Gonzalez to recruit workers to fill their labor needs.  (ECF No. 211-2 at 51.)

20            Viewing this evidence in the light most favorable to Plaintiffs, a reasonable trier of

21   fact could find that an agency relationship existed between Vino and SGLC, and that

22   Vino was bound to the employment contracts entered into between SGLC and Plaintiffs.

23   As such, Vino has not shown as a matter of law that it is entitled to summary judgment

24   on Plaintiffs' breach of contract claim.

25        **C.     Failure to Pay Wages Due under California Law**

26

27            Plaintiffs' third cause of action alleges that Vino violated California law by failing to

28   pay Plaintiffs minimum wages and overtime for time spent waiting for transportation to

1    arrive at the beginning or end of the work day, and for time spent traveling to and from

2    the work sites.  The third cause of action also alleges that Vino failed to reimburse

3    Plaintiffs' inbound travel expenses during their first week of employment, causing their

4    wages to fall below the state minimum in violation of California law.[8]

5              Travel Time Claim

6              Plaintiffs allege that Vino failed to pay Plaintiffs for time spent waiting for their

7    transportation to and from work to arrive at the beginning and end of the workday, for

8    travel time to and from their job locations, and for the time traveling between work

9    locations, in violation of California law.  (ECF No. 67 at 11.)  Vino moves for summary

10   judgment on this claim on the grounds that the undisputed facts establish that Plaintiffs

11   were not required to use SGLC's buses to get to and from the worksites (ECF No. 168-1

12   at 9), and that Plaintiffs have presented no evidence showing that Vino explicitly

13   prohibited Plaintiffs from using their own transportation (id. n.5).  In opposition, Plaintiffs

14   argue that there is a genuine issue of material fact whether Vino required Plaintiffs to

15   travel to the work sites on SGLC's buses, because Plaintiffs did not have any meaningful

16   alternative modes of transportation.  (ECF No. 206 at 18 n.6.)  Plaintiffs also argue that

17   there is a genuine issue of material fact whether they were required to use Defendant's

18   buses to go to and from the work site because they were not aware where they would be

19   working in advance.  (Id. at 18.)  In short, Plaintiffs argue they were effectively required

20   to use Defendant's buses.

21           Under California law, employees must be compensated for all time "during which

22   an employee is subject to the control of an employer."  Morillion, 22 Cal. 4th at 578.  In

23   Morillion, the California Supreme Court addressed the issue whether an employer which

24   requires its employees to travel to a work site on its buses must compensate the

25   employees for travel time.  Id.  The facts in Morillion are similar to the present facts in

---

26   [8] Vino contends that Plaintiffs' third cause of action alleges that Vino and other Defendants are liable for
27   the deduction of the cost of Plaintiffs meals.  (ECF No. 168-1 at 14, 15.)  However, the third cause of
     action contains no specific claim for deducting meal costs.  While Plaintiffs' fact section alleges that
28   Defendants deducted these costs, Plaintiffs fail to include any allegations within the third cause of action
     that suggest a claim for this alleged activity.  (ECF No. 67.)

1   that Defendant hired agricultural employees who were required to meet for work each

2   day at specified assembly areas and were transported in buses provided by Defendant

3   to work sites.  Id. at 579.  The decisive fact in Morillion was that the employees were

4   explicitly prohibited by Defendant's work rules from using their own transportation.  Id.  In

5   reaching its holding, the Court discussed a Fifth Circuit case which addressed whether

6   seasonal farm workers should be compensated for travel time on employer's buses.  Id.

7   at 589 n.5 (discussing Vega, 36 F.3d 417).  The Court found the "fact that the Vega

8   employees were free to choose--rather than required--to ride their employer's buses to

9   and from work, [to be] a dispositive, distinguishing fact."  Id.  Specifically, in Vega, not all

10  of the employees rode on the employer-provided buses, thus demonstrating that using

11  the employer-provided transportation was not required.  Id.  For the Morillion Court, the

12  employees' freedom of choice was a crucial factor in determining whether the employees

13  had been subjected to the employer's control such that compensation for travel time was

14  required.  Id. at 578.  The Court ultimately held that employers who require employees to

15  take certain transportation to a work site, subjecting them to its control by "determining

16  when, where and how they are to travel," must compensate employees for travel time.

17  Id. at 588.  In addition, the Court found that the employer controlled the employees

18  because they "were foreclosed from numerous activities in which they might otherwise

19  engage if they were permitted to travel to the fields by their own transportation."  Id. at

20  586.

21      Vino cites to Overton v. Walt Disney Co., 136 Cal. App. 4th 263 (2006), in support

22  of its argument that employers are not required to compensate employees who use an

23  employer-provided shuttle just because no alternative transportation is available or

24  feasible.  (ECF No. 168-1 at 9.)  But Overton is easily distinguishable and does not

25  support Vino's argument that Plaintiffs were not required to use SGLC's buses.  In

26  Overton, the Court held that employees who used employer-provided shuttles from the

27  assigned parking lot to the park entrance were not entitled to compensation for travel

28  time because the employer did not require its employees to take the shuttle.  136 Cal.

1   App. 4th at 274.  In reaching its holding, the Court found the plaintiff's concession that

2   ten percent of Disney employees used alternative transportation to be dispositive,

3   showing that employees were not required to use the employer-provided shuttles.  Id. at

4   271.  The Court noted that the plaintiffs in Overton had available various modes of

5   transportation including biking, walking, or taking the train or the bus as alternatives to

6   the Disney shuttle.  Id.  Thus, the Court in Overton reached its holding precisely because

7   there were alternative means of transportation available.  The Overton plaintiffs chose to

8   use the employer-provided transportation; they were not required to do so.  Id.

9   (emphasis added).

10       Vino also argues that California Labor Code section 510(b) precludes Vino's

11   liability.  Under section 510(b), "[t]ime spend commuting to and from the first place at

12   which an employee's presence is required by the employer shall not be considered to be

13   part of a day's work, when the employee commutes in a vehicle that is owned, eased, or

14   subsidized by the employer and is used for the purpose of ridesharing, as defined in

15   Section 522 of the Vehicle Code."  However, in Rutti, the Ninth Circuit found that

16   "California Labor Code section 510(b) does not apply to compulsory travel time."  596

17   F.d at 1062 n.2 (citing Morillion, 22 Cal. 4th at 590 n.6).  Thus, section 510(b) did not

18   alter the Court's finding that the employee was under the employer's control while

19   traveling using the employer-provided vehicle, and thus entitled to compensation for that

20   time under California law.  Id. at 1062.

21       Here, there is a genuine issue of material fact whether Plaintiffs could use

22   alternative transportation to get to the work sites.  (ECF No. 216-7.)  In contrast to

23   Overton, there is no evidence that any Plaintiffs used alternative transportation to get to

24   the work sites.  Additionally, unlike the farmworkers in Vega, there is a genuine issue of

25   material fact whether Plaintiffs were free to choose their mode of transportation to get to

26   and from work.  (Id.).  Also distinguishing the present case from Vega is that Vino offers

27   no evidence establishing, or even suggesting, that some Plaintiffs did not ride SGLC's

28   buses.  Vega, 36 F.3d at 425.  While Vino may not have explicitly prohibited employees

1  from using their own transportation as in <u>Morillion</u>, Plaintiffs have presented evidence

2  suggesting that they were de facto required to use the employer-provided buses, as they

3  did not know where they would be going ahead of time and had no other means of

4  transportation.  Because there is a genuine issue of material fact whether Plaintiffs were

5  "free to choose" to ride SGLC's buses, Vino is not entitled to summary judgment on this

6  claim.

7  <u>Failure to Reimburse Pre-Employment Expenses During the First Workweek</u>

8  Plaintiffs' Second Amended Complaint also alleges that "as a result of

9  Defendants' failure to reimburse transportation, visa and recruitment fees authorized by

10 Defendants and benefitting Defendants, Plaintiffs . . . were paid less than $8.00 per

11 hour during the first workweeks in 2008."  (ECF No. 67 at 11.)  Vino contends that

12 California law does not recognize a "de facto deduction" claim similar to that recognized

13 under the FLSA. (ECF No. 168-1 at 16.)  Indeed, Vino correctly points out that "the

14 federal 'de facto deduction' claim recognized under the FLSA is based on specific

15 federal statutes and regulations that do not have close state counterparts."  (<u>Id.</u> (citing

16 <u>Arriaga</u>, 205 .3d at 1237)).  Plaintiffs' Opposition does not dispute Vino's contention on

17 this point.

18 The Court is aware of no case holding that the California Labor Code allows for

19 recovery of amounts that were "de facto deductions" incurred in the first workweek due

20 to pre-employment costs, as does the FLSA.  California Labor Code section 2802 does,

21 however, require that "an employer shall indemnify his or her employee for all necessary

22 expenditures or losses incurred by the employee in direct consequence of the discharge

23 of his or her duties."  Cal. Lab. Code § 2802; <u>see</u> <u>Stuart v. Radio Shack Corp.</u>, 641 F.

24 Supp. 901, 902 (N.D. Cal. 2009).  Section 2802 of the Labor Code "simply states that an

25 employer *shall* reimburse; it says nothing about *when* the duty to reimburse is triggered."

26 <u>Stuart</u>, 641 F. Supp. at 902.  Thus, Plaintiffs have not stated a viable claim.  Accordingly,

27 the portion of Plaintiffs' third cause of action claiming violations of California law for

28 failure to reimburse transportation, visa, and recruitment fees during the first workweek is

30

1    dismissed.

2          D.      **Failure to Provide Meal and Rest Periods Mandated by California Law**

3

4          Plaintiffs' fourth cause of action alleges that Vino "systematically failed to

5    authorize or permit Plaintiffs and other employee to take rest and meal periods in

6    accordance with IWC Order No. 14 and Cal[ifornia] Labor Code § 226.7 and suffered or

7    permitted workers to continue working through their rest and meal periods in violation of

8    law, regularly causing workers to work for [four] or more hours without a rest period or

9    [five] or more hours without a fully relieved meal period."  (ECF No. 67 at 12.)

10          "State law obligates employers to afford their non-exempt employees meal

11   periods and rest periods during the workday."  Brinker Rest. Corp. v. Sup. Ct., 53 Cal.

12   4th 1004, 1018 (2012).  "Labor Code section 226.7(a) prohibits an employer from

13   requiring an employee 'to work during and meal or rest period mandated by an

14   applicable order of the [IWC].'  In turn, Wage Order No. 5, subdivision 12 prescribes rest

15   periods, while subdivision 11, as well as section 512 of the Labor Code, prescribes meal

16   periods."  Id. (quoting Cal. Lab. Code § 226.7(b); Wage Order No. 5(11)(B), 12(B);

17   Murphy v. Kenneth Cole Productions, Inc., 40 Cal. 4th 1094, 1114 (2007)).  In Brinker,

18   the California Supreme Court held:

19          An employer's duty with respect to meal breaks under both section 512[(a)]
            and Wage Order No. 5 is an obligation to provide a meal period to its
20          employees.  The employer satisfies this obligation if it relieves its
            employees of all duty, relinquishes control over their activities and permits
21          them a reasonable opportunity to take an uninterrupted 30-minute break,
            and does not impede or discourage them from doing so. . . . On the other
22          hand, the employer is not obligated to police meal breaks and ensure no
            work thereafter is performed.  Bona fide relief from duty and the
23          relinquishing of control satisfies the employer's obligations, and work by a
            relieved employee during a meal break does not thereby place the
24          employer in violation of its obligations and create liability for premium pay
            under Wage Order No. 5[(b)] an Labor Code section 226.7[(b)]."
25

26   Id. at 1040-41.

27          In this case, Vino contends that it is an undisputed fact that "[w]hen Plaintiffs

28   worked towards an hourly wage rate SGLC directed Plaintiffs as to when to take their

                                                 31

1  meal and rest breaks." (ECF No. 168-2 at 10.)  Vino also contends it is undisputed that

2  "when Plaintiffs worked towards a piece rate standard Plaintiffs made their own

3  determination as to when to take their meal and rest breaks." (Id.)  Vino relies on the

4  deposition testimony of Salvador Gonzalez.  In his deposition, Salvador Gonzalez stated

5  that when the Plaintiffs worked on a piece rate on Vino's property, "the H-2A workers"

6  would decide what time they would take a meal period. (ECF No. 170-1 at 44.)  When

7  they worked at an hourly rate, "SGLC's foremen" decided when Plaintiffs would take

8  meal periods and rest periods.  (ECF No. 170-1 at 45.)  When asked to explain "the

9  policy in regards to lunch periods for H-2A workers," Salvador Gonzalez explained that

10 "they take a half hour lunch. . . . If they started at 7:00 a.m., they would take their break

11 at, I believe, nine o' clock – their first break of fifteen minutes.  And at noon they would

12 take their lunch for half an hour.  And at two o'clock—1:30, two o'clock, they would take

13 another fifteen minute break." (ECF No. 170-1 at 47.)  If the workers were working on a

14 piece rate, Salvador Gonzalez explained that "they would stop and take their breaks

15 whenever they wanted to take their breaks and take their lunch whenever they wanted to

16 take it, as soon as they got hungry." (Id.)  Salvador Gonzalez testified that "their

17 foreman" was responsible for ensuring that the lunch break was taken.  (Id.)  He also

18 testified that lunch periods are a half hour long, and are not paid.  (ECF No. 170-1 at 49.)

19 He testified that the H-2A workers were informed about their right to lunch periods "when

20 [SGLC] gave them safety training . . . the first week they were here . . . before they

21 started working." (ECF No. 170-1 at 49.)  Salvador Gonzalez testified that SGLC's

22 workman's comp carrier provided the training.  (Id.)

23      Plaintiffs, however, argue that these facts are disputed, and offer the translated

24 declaration of Plaintiff Librado Blas Martinez, which states "Salvador's foremen didn't

25 respect the labor laws, the one about a lunch hour and breaks." (ECF No. 219-2 at 11.)

26 Plaintiffs also offer the declaration of Plaintiff Ramon Naranjo, in which he testifies that

27 "during my work with SGLC I was never given any rest periods when I worked in the

28 pear fields, even though I often worked more than eight hours per day.  I and the other

32

1  workers were provided food at both the grape and pear field worksites, but were almost

2  never given a full thirty minute meal break."[9]  (ECF No. 216-7 at 18.)

3       Plaintiffs' evidence creates a genuine issue of material fact whether Vino, through

4  its joint employer SGLC, of all duty, "relinquishe[d] control over [Plaintiffs'] activities and

5  permit[ted] them a reasonable opportunity to take an uninterrupted 30-minute break."  As

6  such, Vino's motion for summary judgment on this claim is denied.

7       **E.    Failure to Pay Wages Due Upon Termination**

8

9       Vino argues that Plaintiffs are not entitled to waiting time penalties because Vino

10  was not Plaintiffs' employer, and even if it was, any alleged failure by Vino to pay

11  termination wages was not willful.  (ECF No. 168-1 at 11.)  Vino contends that there was

12  a good faith dispute whether any wages were due to Plaintiffs, and whether Vino, rather

13  than SGLC, owed Plaintiffs those wages.  Vino claims that this good faith dispute

14  regarding a legal defense entitles Vino to summary judgment.  (Id. at 12.)  In response,

15  Plaintiffs contend they have satisfied their burden of showing Vino acted willfully

16  because Vino jointly employed Plaintiffs, Vino failed to correctly pay Plaintiffs, and failed

17  to honor the terms of the H-2A contract.  (ECF No. 206 at 20.)

18       Under California law, "[i]f an employer discharges an employee, the wages

19  earned and unpaid at the time of discharge are due and payable immediately."  Cal. Lab.

20  Code § 201(a).  Under section 203, "[i]f an employer willfully fails to pay . . . any wages

21  of an employee who is discharged or who quits, the wages of the employee shall

22  continue as a penalty . . . but the wages shall not continue for more than 30 days."  Id.

23  § 203(a).  In the context of section 203, "willful" has been defined as an employer

24  "intentionally fail[ing] or refus[ing] to perform an act which was required to be done."

25  Amaral v. Cintas Corp. No. 2, 163 Cal. App. 4th 1157, 1201 (2008) (citing Barnhill v.

26

_____

27  [9] Vino's objection that this evidence is irrelevant is overruled.  (ECF No. 243 at 81.)  While Naranjo is
    dismissed without prejudice for failure to file a consent to sue form, see infra, this does not preclude him

28  from testifying as a witness.  Vino has not made any objections that would preclude the Court from
    considering the evidence in this respect.

1    Robert Saunders & Co., 125 Cal. App. 3d 1, 7-8 (1981); Davis v. Morris, 37 Cal. App. 2d

2    269, 274 (1940)).

3         However, "a good faith belief in a legal defense will preclude a finding of

4    willfulness." Armenta v. Osmose, Inc., 135 Cal. App. 4th 314, 325 (2005) (citing Barnhill,

5    125 Cal. App. 3d at 8-9.) A good faith dispute exists "when an employer presents a

6    defense, based in law or fact, which if successful, would preclude any recover[y] on the

7    part of the employee." Cal. Code Regs. tit. 8, § 13520(a) (2012). The Code of

8    Regulations further provides that "[t]he fact that a defense is ultimately unsuccessful

9    does not preclude a finding that a good faith dispute did exist. Defenses presented

10   which, under all the circumstances, are unsupported by any evidence, are unreasonable,

11   or are presented in bad faith, will preclude a finding of a 'good faith dispute.'" Id. This

12   regulation imposes an objective standard. FEI Enters., Inc. v. Kee Man Yoon, 194 Cal.

13   App. 4th 790, 802 (2011). Thus, legal uncertainty may lead to a presumption of a good

14   faith dispute. However, the presumption of good faith will be overcome when the plaintiff

15   presents evidence that the employer was aware that its employees were not being fully

16   compensated for their time. See Amaral, 164 Cal. App. 4th at 1202.

17        In Provine v. Office Depot, Inc., the defendant argued that it was entitled to

18   summary judgment because there was a good faith dispute whether a discretionary

19   award of fifty dollars should have been included as part of the plaintiff's wages under

20   section 203. No. C 11-00903 SI, 2012 WL 2711085, at *6 (N.D. Cal. July 6, 2012). The

21   Court rejected the defendant's argument, stating that the "defendant has not

22   demonstrated that it is entitled to summary judgment on this ground. Neither party has

23   submitted any evidence regarding the reasonableness of [the defendant's] decision not

24   to factor Bravo awards into the regular rate of pay, and thus the Court cannot conclude

25   on this record that a good faith dispute exists." Id. at *7.

26        As in Provine, Vino has failed to demonstrate that it is entitled to summary

27   judgment for Plaintiffs' section 203 claim. Vino argues that there is a good faith dispute

28   that Vino did not employ Plaintiffs and therefore had no duty to pay termination wages.

34

1    (ECF No. 168-1 at 12.)  However, the parties have not submitted any evidence regarding

2    the reasonableness of Vino's failure to pay Plaintiffs the wages they contend they were

3    owed upon termination.  See Amaral, 163 Cal. App. 4th at 1202.  Accordingly, the Court

4    cannot conclude on the record before it that a good faith dispute exists, and Vino's

5    motion for summary judgment is denied for this claim.

6          **F.**      **Violation of Employee Housing Act**

7

8         Plaintiffs' sixth cause of action alleges violations of sections 17000 et seq. of the

9    California Health and Safety Code ("the Employee Housing Act").  Plaintiffs' Second

10    Amended Complaint alleges that "at all times relevant to this action, the SGLC

11    Defendants, Defendant Julian Gonzalez and Defendant Vino Farms, Inc. knowingly and

12    willfully maintained Labor Camp 17 heretofore described in a manner that failed to

13    comply with applicable health, safety, and building codes in violation of Health and

14    Safety Code § 17001 et seq. and its implementing regulations."  (ECF No. 67 at 13.)

15    Plaintiffs allege that Labor Camp 17 was owned by Defendant Vino Farms, and operated

16    or managed by SGLC.  (Id. at 8.)

17         Vino contends that it cannot be liable under the Employee Housing Act ("EHA")

18    because it "did not construct, operate, or maintain the housing at Camp 17."  (ECF No.

19    168-1 at 18.)  In fact, Vino claims that SGLC "was solely responsible for operating and

20    maintaining Labor Camp 17."  (Id. at 19.)  Plaintiffs respond both that Vino's "foreman

21    Mike Harder was assigned to oversee the housing at Labor Camp 17," and, even though

22    Vino "did not directly maintain the housing, it was nonetheless responsible to ensure it

23    met the minimum state and federal habitability and housing code standards."  (ECF No.

24    206 at 14.)  Neither party disputes that Defendant Vino Farms owns Camp 17.  (ECF

25    Nos. 206 and 241.)

26         California law states that "[e]very person, or the agent or officer thereof,

27    constructing, operating, or maintaining employee housing shall comply with the

28    requirements of this part, with building standards published in the State Building

1   Standards Code relating to employee housing, and with the other regulations adopted

2   pursuant to this part."  Cal. Health & Safety Code § 17037.  Furthermore, "person" is

3   defined as "any natural person, firm, association, organization, partnership, business

4   trust, company, joint stock company, corporation, limited liability company, joint venture,

5   or other organizations of persons."  Id. at § 17009.5(a).  The Legislature enacted the

6   EHA based on its "determin[ation] that those who provide employee housing should bear

7   the burden of ensuring it meets minimum health and safety standards for the protection

8   of its inhabitants and the community."  Reyes v. Kosha, 65 Cal. App. 4th 451, 461

9   (1998).  In Reyes, the Court found a triable issue of fact existed as to whether the

10  defendant operated and maintained a labor camp when the defendant "strictly controlled

11  who lived in the camp," "provided workers with portable toilets and organized the

12  workers to run a waterline to the camp," "provided materials for them to install faucets

13  and showers in the camp," and "provided a mailbox so they could receive mail at the

14  farm."  Id. at 465.  Although there is not such evidence before the Court in this case,

15  Plaintiffs' burden requires only that they offer evidence of a genuine issue of material

16  fact whether Vino operated and maintained Camp 17.  The Court in Reyes stated that

17  "from [the] evidence, a trier of fact could reasonably conclude that [the defendant]

18  maintained or operated the employee housing on his property . . . ."  Id.  However, the

19  Court did not hold that such evidence is required for the Court to find that a defendant

20  "operated" or "maintained" employee housing within the meaning of the statute.

21        Plaintiffs have offered evidence that Vino owned Camp 17 (ECF Nos. 211-2 at 65;

22  211-3 at 23; 219-4 at 5) and that Vino allowed SGLC to use Camp 17 free of charge

23  (ECF No. 211-3 at 23).  Plaintiffs also offer evidence that Vino's foreman, Mike Harder,

24  was assigned to take care of "Ranch 17" (ECF No. 211-2 at 65) and that Mike Harder

25  was there at "Ranch 17" when Plaintiffs arrived from Colima (ECF No. 211-2 at 65).[10]

26

27  ---
    [10] While Julian Gonzalez testified about "Ranch 17," not "Camp 17," this testimony was provided during the
    course of questioning about Plaintiffs' living accommodations.  Viewing the evidence in the light most
    favorable to Plaintiffs, a reasonable trier of fact could find that "Ranch 17" and "Camp 17" were used

28  interchangeably during Julian Gonzalez's testimony.  (ECF No. 211-2 at 65.)

1   Given these facts, a disputed issue of material fact exists about whether, and to what

2   extent, Vino "maintained" or "operated" Camp 17.  Accordingly, Vino's motion for

3   summary judgment on this claim is denied.

4       Vino also contends that fifteen Plaintiffs admit that they never stayed at Camp 17.

5   (ECF No. 168-1 at 19.)  Thirteen Plaintiffs[11] admitted in response to request for

6   admission No. 14 that they never stayed at Camp 17.  (Id. (citing ECF Nos. 170-6

7   through 170-18).)  Additionally, two Plaintiffs[12] failed to respond to the requests for

8   admission, and thus the request to admit that Plaintiffs never stayed at Camp 17 is

9   deemed admitted pursuant to Rule 36(a)(2).

10      Courts have held that a request to admit, to which the served party did not

11  respond, may provide the sole grounds for an award of summary judgment for the

12  requesting party."  See, e.g., Donovan v. Carls Drug Co., 703 F.2d 650, 651 (2d

13  Cir.1983); Cereghino v. Boeing Co., 873 F. Supp. 398, 403 (D. Or. 1994); Kyung Hee

14  Park v. Kim, Dong Hyen, CV-08-0004-GA, 2007 WL 2122165 (N. Mar. I. July 17, 2007).

15  Because Plaintiffs have failed to respond to Vino's request for admission that Plaintiffs

16  never stayed at Camp 17, the Court deems this fact admitted as to these two Plaintiffs.

17      While there is a triable issue whether Vino "maintained" or "operated" Camp 17,

18  Vino cannot have violated these fifteen Plaintiffs' rights under the EHA.  There is no

19  genuine issue of material fact regarding Vino's liability to these Plaintiffs.  Thus, the

20  Court grants summary judgment to Vino on Plaintiffs' EHA claim as to these fifteen

21  Plaintiffs who never stayed at Camp 17.

22      **G.    Unfair Competition**

23

24      Vino further moves for summary adjudication of the seventh cause of action for

25  violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200

26  _____

[11] Roberto Cruz Barragan, Gibran Rigoberto Diaz Campo, Obed Mares Contreras, Uriel Torres Contreras,
27  Luis Manuel Torres Contreras, Marco Cesar Garcia Gutierrez, Benigno Martinez Marquez, Jesus Junior
Robles Rodriguez, Leonel Esparza Ramirez, Rene Meza Sanchez, Oscar Manuel Carillo Torres, Christian
28  Cruz Valverde, and Paul Salgado Villafan.  (ECF No.170 at 2 (citing ECF Nos. 170-6 through 170-18).)
[12] Demetrio Montes Gaitan and Armando Zuniga Arias.  (ECF No. 170 at 2.)

1    et seq. "In order to state a claim for a violation of the [UCL], a plaintiff must allege that

2    the defendant committed a business act that is either fraudulent, unlawful, or unfair."

3    Levine v. Blue Shield of Cal., 189 Cal. App. 4th 1117, 1136 (2010). The UCL "protect[s]

4    both consumers and competitors by promoting fair competition in commercial markets

5    for goods and services." Kasky v. Nike, Inc., 27 Cal.4th 939, 949 (2002). "Because [the

6    UCL] is written in the disjunctive, it establishes three varieties of unfair competition—acts

7    or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is

8    prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." Cel–Tech

9    Comms., Inc. v. L.A. Cellular Tel. Co., 20 Cal.4th 163, 180 (1999). Plaintiffs assert this

10    claim under the UCL's unlawful prong.  An unlawful business practice is one that "is

11    forbidden by any law," Olszewski v. Scripps Health, 30 Cal.4th 798, 827 (2003), and

12    "[v]irtually any law—federal, state or local—can serve as a predicate for a section 17200

13    action," State Farm Fire & Cas. Co. v. Sup. Ct., 45 Cal. App. 4th 1093, 1102–03 (1996),

14    abrogated on other grounds by Cel–Tech Comms., Inc., 20 Cal.4th at 180.

15        Plaintiffs' claim for unfair competition pursuant to California Business and

16    Professions Code § 17200 is grounded in Plaintiffs' allegations that Vino violated the

17    California Labor Code and the FLSA.  Vino contends that because Plaintiffs have failed

18    to show that Islands is liable under any of the Labor Code statutes, Vino is entitled to

19    summary judgment on Plaintiffs' UCL claim.  Given that Vino has failed to meet their

20    initial burden on summary judgment as to Plaintiffs' FLSA claim and California Labor

21    Code claims, Vino is not entitled to summary judgment for this cause of action.

22        **H.**     **Fraud and Misrepresentation**

23

24        Plaintiffs' eighth cause of action is for fraud and misrepresentation.  Plaintiffs'

25    ninth cause of action alleges solicitation of employees by misrepresentation in violation

26    of section 970 of the California Labor Code.  Again, although not stated clearly by

27    Plaintiffs, the Court construes Plaintiffs argument to allege an agency relationship

28    between Vino and SGLC.

1    The elements of an action for fraud are: (1) misrepresentation; (2) knowledge of

2  falsity; (3) intent to defraud, i.e. to induce reliance; (4) justifiable reliance; and (5)

3  resulting damage.  Lazar v. Sup. Ct., 12 Cal. 4th 631, 638 (1996) (internal citations

4  omitted).  Agency law imposes liability upon an innocent principal for the torts of his

5  agent, including fraud, committed within the scope of the agency relationship.  See

6  Garton v. Title Ins. & Trst Co., 165 Cal. App. 3d 365, 375 (1980).  Likewise, section 970

7  of the California Labor Code provides:

8    No person, or agent or officer thereof, directly or indirectly, shall influence,
    persuade, or engage any person to change from one place to another in
9    this State or from any place outside to any place within the State, or from
    any place within the State to any place outside, for the purpose of working
10    in any branch of labor, through or by means of knowingly false
    representations, whether spoken, written, or advertised in printed form,
11    concerning either:
        (a) The kind, character, or existence of work;
12        (b) The length of time such work will last, or the compensation
        therefor; . . . .
13

14    Plaintiffs have put forth evidence creating genuine issues of material fact about

15  whether SGLC and Vino had an agency relationship.  See supra.  Because a principal

16  may be liable for the fraud of its agent, and an agent may be liable under section 970,

17  Vino is not entitled to summary judgment on Plaintiffs' eighth and ninth causes of action.

18  In short, because a reasonable trier of fact could find that an agency relationship existed

19  between the Defendants, see supra, and because Vino has not sufficiently demonstrated

20  that SGLC did commit fraud and misrepresentation, the Court cannot conclude that, as a

21  matter of law, Vino is not liable for fraudulent misrepresentation or violations of section

22  970 of the California Labor Code.

23    **I.    Consent to Sue Forms**

24

25    Vino argues that the majority of the opt-in Plaintiffs filed their consent forms after

26  the opt-in period had ended, and thus these Plaintiffs should be dismissed from the

27  action.  Additionally, Vino argues that the opt-in Plaintiffs never consented to sue Vino,

28  and thus their claims against Vino must be dismissed.  The Court declines to reach

1   these issues because all opt-in Plaintiffs were dismissed without prejudice from the case,

2   pursuant to the Court's order issued this same day.  Accordingly, Vino's motion is denied

3   as moot as it applies to the opt-in Plaintiffs.

4        Vino also asserts that five named Plaintiffs failed to file consents at all in the

5   action.  These Plaintiffs are Armando Zunigas Arias, Daniel Becerra Aguilar, Oscar

6   Manuel Carrillo Torres, Jorge Luis Rendon Silva, and Luis Ramon Naranjo Campos.

7   (ECF No. 168-2 at 15.)  Plaintiffs do not dispute this fact (ECF No. 206-3 at 139.)  Vino

8   contends that these Plaintiffs must be dismissed.  Plaintiffs do not oppose dismissal of

9   Plaintiff Arias, but argue that dismissal of the remaining four Plaintiffs is unwarranted.

10  (ECF No. 206 at 15.)  Plaintiffs state that "counsel has been unable to locate the consent

11  to sue forms" for these Plaintiffs, but "will gather consent to sue forms for those Plaintiffs

12  as soon as possible if they are not promptly located."  (ECF No. 206 at 15.)  Plaintiffs

13  made this representation to the Court on May 17, 2012, (id.) and now, nearly six months

14  later, have failed to file consent to sue forms for these four Plaintiffs.

15     An FLSA collective action is deemed commenced for limitations purposes for the

16  named plaintiff only when he or she has filed both a complaint and a consent to sue

17  form.  See Albritton v. Cagles, Inc., 508 F.3d 1012 (11th Cir. 2007); see also 29 U.S.C.

18  § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his

19  consent in writing to become such a party and such consent is filed in the court in which

20  such action is brought.").  The Ninth Circuit has stated that "the FLSA claim of a plaintiff

21  who has failed to file a written consent is subject to dismissal [w]ithout prejudice." Real,

22  603 F.2d at 756.  Although Plaintiffs argue that "it would be against the interest of both

23  judicial economy and the interest of all the parties" to dismiss these Plaintiffs, the Court

24  is bound by the language of the statute.  See Albritton, 508 F.3d at 1017 ("We are not

25  empowered to rewrite statutes.").  Accordingly, the named Plaintiffs who have not yet

26  filed consent to sue forms are dismissed without prejudice.

27     To the extent that Vino argues that named Plaintiffs, rather than Opt-Ins, should

28  be dismissed for failure to file their consent forms on time, the Court finds that Vino is not

40

1    prejudiced by the late filing of these consents.  The majority of the consent forms were

2    filed two weeks after the conclusion of the opt-in notice period, which ended on June 18,

3    2009.  Plaintiffs filed the opt-in forms on July 2, 2009.  While Vino cites to conclusion of

4    the opt-in notice period, which ended on June 18, 2009.  Plaintiffs filed the opt-in forms

5    on July 2, 2009.  While Vino cites to <u>Reyes v. Texas EZ Pawn, L.P.</u>, 459 F. Supp. 2d

6    546, 566-67 (S.D. Tex. 2006), the Court there dismissed the opt-in Plaintiffs because the

7    consent forms were postmarked after the expiration of the opt-in period.  In the present

8    case, the consent forms filed on July 2, 2009, were all signed prior to the end of the opt-

9    in notice period.  (ECF No. 36.)  There is no evidence of when these consent forms were

10   post-marked.  In light of these circumstances, the Court finds that dismissal of these

11   Plaintiffs, to the extent that they are 'original named Plaintiffs' and not 'opt-in Plaintiffs' is

12   not appropriate.[13]

13          Finally, Vino contends that Plaintiffs cannot consent to sue Vino because the

14   consent form did not name Vino as a defendant in the action.  However, the plain

15   language of the statute requires that Plaintiffs consent to participate in an "action."  29

16   U.S.C. § 216(b).  The statute does not require that Plaintiffs file a consent form to

17   participate in an action against each individual defendant.  <u>See</u> <u>Prickett v. Dekalb Cnty.</u>,

18   349 F.3d 1294, 1297 (11th Cir. 2003) (Finding that the plain language of § 216(b)

19   "indicates that plaintiffs do not opt-in or consent to join an action as to specific claims,

20   but the action as a whole.")  While <u>Prickett</u> dealt with the addition of claims, the Court

21   finds that the addition of defendants is no different, as Plaintiffs opted in to the action as

22   a whole, which includes the action against the later-added defendants, including Vino.

23   Thus, Vino's motion for summary judgment on this point is denied.

24

25

26

27
_____
28   [13] However, the Court notes that all Opt-in Plaintiffs (not originally named Plaintiffs who signed consents)
     are dismissed pursuant to the Court's order issued this same day.

**CONCLUSION**

For the reasons set forth above, it is hereby ordered that:

1. Vino's Motion for Summary Judgment on the issue of joint employment under the FLSA is GRANTED as to Plaintiffs Joel Gonzalez Avila and Francisco Ceja Sandoval, and DENIED as to all other Plaintiffs.

2. Vino's Motion for Summary Judgment is GRANTED for Plaintiffs' claim for de facto deductions during the first workweek.

3. Vino's Motion for Summary Judgment is DENIED for Plaintiffs' claim for travel time under the FLSA.

4. Vino's Motion for Summary Judgment is DENIED as to Plaintiffs' breach of contract claim.

5. Vino's Motion for Summary Judgment is DENIED as to Plaintiffs' claim for travel time violations under California law.

6. Plaintiffs' claim for failure to reimburse pre-employment expenses during the first workweek under California law is DISMISSED.

7. Vino's Motion for Summary Judgment on Plaintiffs' claim for failure to provide meal and rest periods under California law is DENIED.

8. Vino's Motion for Summary Judgment on Plaintiffs' claim for failure to pay wages due upon termination is DENIED.

9. Vino's Motion for Summary Judgment on Plaintiffs' claim for violations of the Employee Housing Act is DENIED as to the Plaintiffs who lived in Camp 17, and GRANTED as to the Plaintiffs who did not live in Camp 17.

10. Vino's Motion for Summary Judgment on Plaintiffs' UCL claim is DENIED.

11. Vino's Motion for Summary Judgment on Plaintiffs' claim for fraud is DENIED.

12. Vino's Motion for Summary Judgment on Plaintiffs' claim for violations of California Labor Code section 970 is DENIED.

13. The four Plaintiffs who have not filed opt-in forms are DISMISSED WITHOUT

42

1   PREJUDICE.

2       14.  Vino's Motion for Summary Judgment for late filing of Plaintiffs' opt-in forms is

3   DENIED.

4

5       IT IS SO ORDERED.

6

7       Dated: November 15, 2012.

8

9

10      MORRISON C. ENGLAND, JR
        CHIEF UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28